1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

| | |
|---|---|
| MARGARITA HERNANDEZ, individually and as executor of the Estate of RICARDO HERNANDEZ, | Case No. 2:18-CV-01473-BJR |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| FEDERAL WAY, BLAKE LOSVAR, TANNER PAU AND SEVERAL JOHN AND JANE DOE OFFICERS, | |
| Defendants. | |

## I.    INTRODUCTION

In the evening hours of October 8, 2016, Ricardo Hernandez ("Ricardo") was shot and killed by two Federal Way Police Officers.  The shooting occurred after a brief standoff at the home where Ricardo lived with his mother, stepfather, and two brothers.  Plaintiff, Ricardo's mother, initiated this action against the City of Federal Way and the officers involved in the shooting (collectively "Defendants"), alleging claims under both federal and Washington law. Currently before the Court is Defendants' motion for summary judgment, Plaintiff's opposition

thereto, and Defendants' reply in support of the motion.  Dkt. Nos. 30, 48, 55.  Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will GRANT the motion.

## II.    FACTUAL BACKGROUND

On October 8, 2016 at approximately 5:35 in the evening, 911 emergency services received a phone call from Ricardo's mother, Margarita Hernandez, at the Camelot Square Trailer Park in Federal Way, Washington.  Dkt. No. 31-2.  She was frantic and requested that the police "[p]lease . . . come to my house . . . right now."  *Id*. at 1.  There was a lot of background noise, including screaming, and the 911 operator had a difficult time understanding Ms. Hernandez.  *Id*.  After a few seconds, Ms. Hernandez handed the phone to her son, Joel, who reported that his brother, Ricardo, had four knives that were "about a foot" long and that Ricardo was "trying to kill us right now."  *Id*. at 1, 6.  Joel pleaded with the 911 operator to send police officers to their home: "He keeps throwing (unreadable) . . . destroying the house.  He's destroying the house . . . Please he's trying to kill us."  *Id*. at 4.  Joel informed the operator that he, Ms. Hernandez, his stepfather, and his other brother were barricaded in a room, but that Ricardo was "right outside the door" and "he's going to break the door."  *Id*. at 6.

Federal Way Police Officers Blake Losvar, Tanner Pau, Chase Smith, and Lieutenant Brigham Schulz were dispatched to the family's residence to respond to a "domestic [dispute] with a knife" at approximately 5:40 PM.  Dkt. No. 31-4 at 2.  The dispatch report notified the police officers that Joel claimed that Ricardo had "mental health issues."  *Id*. at 2.

Officer Losvar was the first to arrive at the scene, followed shortly after by Officer Pau at approximately 5:45 PM.  Dkt. Nos. 32-2 at 4; 36-1 at 4.  Officers Losvar and Pau testified that they could see a man, woman, and two boys through what appeared to be a bedroom window in

the trailer home and that the individuals "appeared to be extremely scared", "frozen in fear", and "were speaking in soft voices."  Dkt. Nos. 32-2 at 5; 36-1 at 5.  Officers Losvar and Pau were able to evacuate Ms. Hernandez, Joel, and his brother out the bedroom window, but Mr. Zambrano, who had barricaded himself against the door of the bedroom, hesitated to leave his position because he was afraid that Ricardo would enter and harm him before he could make it out the window. Dkt. No. 40-1 at 10:14–25.  Officer Losvar later testified that he also feared that Ricardo would injure or kill Mr. Zambrano if he successfully breached the door.  Dkt. No. 32-2 at 5.

Officer Losvar testified that during this time he looked through a different window in the trailer and he saw Ricardo standing "approximately 10 feet from me" and "hold[ing] multiple knives" in his hands.  Dkt. No. 32-2 at 5.  Officer Losvar claims that he made eye contact with Ricardo, identified himself as a police officer, and ordered Ricardo to put down the knives.  *Id.* He alleges that Ricardo did not comply with his instructions, but instead moved toward the other side of the trailer.  *Id.* at 5–6.

Officer Pau testified that he was able to safely evacuate Mr. Zambrano from the bedroom window and that he and Officer Losvar then escorted the family to a nearby shed.  *Id.* at 6.  There is a dispute as to whether the family could see the scene at the trailer unfold from where they were standing by the shed.  Mr. Zambrano testified that he could see "everything" from his vantage point (Dkt. No. 51-4 at 5) while Officer Losvar claims that the family could no longer see the trailer from where they were standing (Dkt. No. 32-2 at 6).  Officer Losvar testified that, at this time, one of the family members told him that Ricardo had threatened to stab and kill the family. Dkt. No. 32-2 at 6.  In light of this and his own observations, Officer Losvar determined that he had probable cause to arrest Ricardo for felony harassment and broadcast the same over his police

radio.  *Id*.  He also asked for additional officers to join him at his location and requested that an officer respond to the scene with a less lethal 40 mm shotgun.  *Id*.

Corporal Riggles and Officers Chase Smith, Shawn Warrick, and others arrived on the scene and established a perimeter around the trailer home.  Dkt. Nos. 30 at 5-6:7, 18; 32-2 at 6.  Meanwhile, Officer Pau moved to the rear of the trailer home where he positioned himself in the "small backyard area, at the northeast corner of the trailer."  Dkt. No. 36-1 at 5.  Officer Pau claimed that from his position, he had "a clear unobstructed view of the backdoor of the trailer," which was elevated above the ground "by a wooden landing area just outside the door" that had 2-3 steps leading down to the ground level.  *Id*.  Officer Pau testified that the backdoor of the trailer was "approximately fifteen to twenty feet from" where he was standing.  *Id*.  This is another area of dispute.  Plaintiff alleges that Officer Pau was more than 21 feet from the backdoor.  Dkt. No. 48 at 3:9–11.

Officer Pau testified that Ricardo opened the backdoor and yelled, "'Fuck you! Kill me!'"  Dkt. No. 36-1 at 5.  Officer Pau claimed that Ricardo opened and closed the door a few more times and, at that point, Officer Pau became "concerned for [his] personal safety as [he] was unable to make constant visual contact with Ricardo, did not know whether [Ricardo] had additional weapons, [Ricardo] continued to act in an aggressive and angry manner, and [Officer Pau] did not know if the trailer was clear of all other occupants."  *Id*. at 6.  In addition, Officer Pau was aware that Officer Losvar had determined that probable cause existed to arrest Ricardo for felony harassment.  *Id*. at 5.  Officer Pau request that another police officer join him in the backyard behind the trailer and Officer Losvar joined him.  *Id*. at 6.  Both officers testified that they continued to advise Ricardo that he was under arrest and to slowly exit the residence unarmed.  Dkt. Nos. 32-2 at 6; 36-1 at 6.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 4

Officers Losvar and Pau alleged that Ricardo continued to partly open and close the backdoor in an agitated manner, shouting at the officers to kill him.  Dkt. Nos. 32-2 at 6; 36-1 at 6.  This continued for another few minutes until, the officers allege, Ricardo opened the door and stepped onto the wooden landing toward the stairs leading down to the ground level.  *Id*.  Officers Losvar and Pau both testified that Ricardo was holding a large kitchen knife in one hand and two more knives in his other hand.  *Id*.  Officer Pau testified that at that point he "became concerned that Ricardo now posed a direct threat of serious physical injury to Officer Losvar or [him]self."  Dkt. No. 36-1 at 6.  He testified that he felt Ricardo posed a serious threat to them because "[1] the distance between us would easily be covered by a simple jump from the [wooden landing], [2] Ricardo was armed with multiple weapons, [3] he recognized us as law enforcement, [4] he was agitated and angry, and [5] refused to response to commands."  *Id*.

The officers reported that Ricardo continued to yell "just fucking kill me!" and then he "abruptly stepped forward as if he was about to come at [the officers], while raising the knives from his sides to about his abdomen level in [the officers'] direction."  Dkt. No. 36-1 at 6; *see also* Dkt. No. 32-2 at 6 (stating that Ricardo "looked directly at [the officers] with a piercing stare and [] started to advance toward [them] in an aggressive fashion.").  Both Officer Losvar and Officer Pau testified that they believed Ricardo was about to attack them and, as such, they fired their guns simultaneously.  Dkt. Nos. 32-2 at 7; 36-1 at 6.  They collectively fired nine rounds, six of which struck Ricardo in the head, shoulder, and chest.  Dkt. No. 40-17 at 18:8–18.  The officers testified that when the rounds struck Ricardo, he fell backwards into the trailer's doorway, dropped the knives, and landed on his back.  Dkt. Nos. 32-2 at 7; 36-1 at 6.  Officer Losvar recalled seeing "knives laying on the deck" after Ricardo was shot.  Dkt. 32-2 at 7.  He then radioed for medics who pronounced Ricardo deceased at the scene when they arrived.  *Id*.; Dkt. No. 51-7 at 3.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 5

### III.    LEGAL STANDARD

Rule 56 provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Fed. Home Loan Mortg. Corp. v. SFR Investments Pool 1, LLC*, 893 F.3d 1136, 1144 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1618 (2019). Disputes over facts become "material" only where they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As such, "materiality is based on the substantive law at issue." *Id.* A "genuine dispute of material facts," occurs where the "evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.* The moving party bears the "initial responsibility of informing the district court of the basis for its motion," including "identifying those portions of the pleadings . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). In meeting this burden, the nonmoving party must go beyond the pleadings and show "by her own affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir. 1992) (citing *Celotex Corp.*, 477 U.S. 317 at 324). Further, "[w]here the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

Where the moving party has met its initial burden, the nonmovant must respond by showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. "If the nonmoving party fails to establish the existence of a genuine issue of material fact, 'the moving party is entitled to judgment as a matter of law.'" *Perfect Co. v. Adaptics Ltd*., 374 F. Supp. 3d 1039, 1041 (W.D. Wash. 2019)

(quoting *Celotex Corp.*, 477 U.S. at 323–24). In conducting its evaluation of the merits of a motion for summary judgment, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, the Court must "view 'the evidence in the light most favorable to the nonmoving party.'" *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019) (quoting *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 949 (9th Cir. 2002)).

## IV.   DISCUSSION

Plaintiff brings six claims against Defendants. Dkt. No. 19. Two federal claims pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Ricardo's Fourth Amendment right to be free from unlawful seizure and the use of excessive force and that Defendants violated her Fourteenth Amendment right to the companionship of her son, as well as four state claims, alleging assault, negligence, outrage, and discrimination under Washington law. *Id.*

Defendants move for summary judgment on each of Plaintiff's claims. Dkt. No. 30. With respect to the two § 1983 claims, they argue that the undisputed material facts establish that Officers Losvar and Pau had probable cause to arrest Ricardo and to use deadly force in response to the imminent threat he presented. *Id.* at 16–23. They further argue that the undisputed material facts establish that Defendants did not wrongfully deprive Plaintiff of her parent-child relationship with Ricardo. *Id.* at 23. Alternatively, Defendants contend that the officers are entitled to federal qualified immunity on these claims.[1] *Id.* at 23–24. Defendants also move to dismiss each of

---

[1] Defendants contend that Plaintiff also attempted to bring a *Monell* claim against the City of Federal Way and moves for summary judgment on that claim as well. Dkt. No. 30 at 24–26. The Court has reviewed the Amended Complaint and finds that Plaintiff failed to allege the requisite elements of a *Monell* claim. *See* Dkt. No. 19. Moreover, she entirely fails to address Defendants' argument with respect to this claim in her opposition to the summary judgment motion. Therefore, the Court concludes that to the extent Plaintiff alleges a *Monell* claim in the amended complaint, she has conceded the issue and the claim is dismissed.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 7

Plaintiff's state claims, arguing that the claims are not factually or legally supported, and that Defendants are immune from such claims. *Id*. at 26–31.

The Court will address each of Plaintiff's claims in turn.

**A.    The Federal Claims**

As stated above, Plaintiff brings two federal claims pursuant to 42 U.S.C. § 1983.  Dkt. No. 19.  First, she alleges that Defendants violated Ricardo's Fourth Amendment right to be free from unreasonable seizure and use of excessive force.  Second, she alleges that Defendants violated her Fourteenth Amendment liberty interest in the companionship and society of her child (*i.e.*, Ricardo).  In order to succeed on her § 1983 claims, Plaintiff must establish that: (1) Defendants were acting under the color of state law when they committed the conduct complained of; and (2) that conduct deprived Ricardo and/or Plaintiff of a right, privilege, or immunity secured by the U.S. Constitution or federal statutes. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986).  Here, there is no dispute that Defendants acted under the color of state law when they shot Ricardo.  Thus, the Court's analysis of Plaintiff's § 1983 claims focuses on whether Defendants violated Ricardo's and/or Plaintiff's constitutional rights.

**1.    The Fourth Amendment Claim: Unreasonable Seizure and Use of Excessive Force**

Plaintiff argues that Officers Losvar and Pau violated Ricardo's Fourth Amendment right to be free from unreasonable seizure and the use of excessive force.  Dkt. No. 19 at 11.  Specifically, she alleges that (1) the officers did not have probable cause to arrest (*i.e.*, seize) Ricardo; and that (2) they used excessive force when they shot him. *Id*.

***a.    Unreasonable Seizure***

It is blackletter law that the Fourth Amendment prohibits arrests without probable cause. *Beck v. Ohio*, 379 U.S. 89, 90–91 (1964).  Probable cause exists if the totality of the circumstances

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 8

within an officer's knowledge would cause a reasonably prudent officer to believe that a crime has been, or is currently, being committed. *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009). The "factual matters underlying the judgment of reasonableness" are generally a "question for the jury." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984); *see Thomas v. Cannon*, No. 3:15-05346, 2017 WL 2289081, at *8 (W.D. Wash. May 25, 2017).

Ms. Hernandez alleges that significant questions of material fact exist as to whether Officers Losvar and Pau had probable cause to arrest Ricardo on the night of the shooting and therefore, she argues, summary judgment on this issue is inappropriate. Dkt. No. 48 at 10–13. Defendants counter that summary judgment is warranted because there are no material facts in dispute as to whether the officers had probable cause to arrest Ricardo for felony harassment. Dkt. No. 30 at 16–17. They point to the following, undisputed evidence: (1) Officers Losvar and Pau received the dispatcher's report in which Joel claimed that Ricardo had knives and was trying to kill them; (2) upon arriving at the scene, Officers Losvar and Pau observed the family barricaded in room with Mr. Zambrano holding the door shut to prevent someone from entering the room; (3) Mr. Zambrano hesitated to leave his position at the door because he was afraid that Ricardo would enter and harm him before he could make it out the window; and (4) Officer Losvar observed Ricardo through one of the trailer windows holding multiple knives. *Id.* at 17.

Officer Losvar also testified that after evacuating the family to safety, one of the family members told him that Ricardo had threatened to kill them that evening. Dkt. No. 32-2 at 6. Plaintiff adamantly disputes that this conversation occurred; as such, the Court disregards this testimony from Officer Losvar. Dkt. No. 48 at 3:1–2. Nevertheless, even without this testimony, the Court concludes that the remaining undisputed evidence overwhelmingly supports Officer Losvar's belief that Ricardo "had committed or was committing an offense" such that probable

cause existed for his arrest. *Beck*, 379 U.S. at 90–91. Although the issue of probable cause is usually reserved for a jury, in light of the undisputed evidence presented, this Court concludes that no reasonable jury could find for Plaintiff on this issue and, thus, summary judgment is warranted.

In reaching this conclusion, the Court finds the Ninth Circuit's decision in *Lassiter v. City of Bremerton* illustrative. 556 F.3d 1049 (9th Cir. 2009). In *Lassiter,* a married couple brought a 42 U.S.C. § 1983 action against the city and its responding officers who arrested the husband following a neighbor's 911 call about a possible domestic disturbance. *Lassiter*, 556 F.3d at 1053–1054. When the officers entered the home, the husband attempted to impede their ability to get the wife to safety and would not obey the officer's command to sit down. *Id.* at 1053. The couple later sued the officers, alleging that they had entered their residence without a warrant and arrested the husband without probable cause, in violation of their Fourth Amendment rights. *Id.* The officers moved for summary judgement, which the district court granted. *Id.* at 1054. The plaintiffs appealed, arguing that summary judgment was not appropriate because disputes of material fact existed. *Id.* at 1053. The Ninth Circuit acknowledged the existence of factual disputes in the record but agreed with the district court that there were sufficient material facts that were not in dispute to allow the district court to conclude that the officers had probable cause to arrest the husband. *Id.* Likewise, in the case before this Court, while some of the factual allegations are in dispute (*e.g.*, whether a family member told Officer Losvar that Ricardo had threatened to kill them), these disputes are not material in light of the other undisputed evidence that establishes that Officer Losvar had probable cause to arrest Ricardo for felony harassment.

### b.   Excessive Force

Plaintiff next argues that Officers Losvar and Pau violated Ricardo's Fourth Amendment right to be free from excessive force. Dkt. Nos. 19 at 11; 48 at 11–22. Claims of excessive force

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 10

1   are examined under the Fourth Amendment's reasonableness standard, which requires that police

2   officers making an arrest use only the amount of force that is objectively reasonable in light of the

3   circumstances facing them.  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  As the Supreme

4   Court explained in *Graham*, "the 'reasonableness' inquiry is an objective one: the question is

5   whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

6   confronting them, without regard to their underlying intent or motivation."  490 U.S. at 387.  The

7   "calculus of reasonableness must embody allowance for the fact that police officers are often

8   forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

9   evolving—about the amount of force that is necessary in a particular situation."  *Kisela v. Hughes*,

10  138 S. Ct. 1148, 1152 (2018) (quoting *Graham,* 409 U.S. at 396–397).

11      Under *Graham*, three factors must be considered in assessing the reasonableness of the

12  force used: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat

13  to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting

14  to evade arrest by flight.  *See Smith v. City of Hemet*, 394 F.3d 698, 701 (9th Cir. 2005) (citing

15  *Graham*, 490 U.S. at 396).  Whether the suspect poses a threat to the safety of officers or others is

16  "the most important single element of the three specified factors."  *Chew v. Gates*, 27 F.3d 1432,

17  1441 (9th Cir. 1994).

18      The Court finds that the first factor—the severity of the crime at issue—is easily satisfied.

19  As this Court has already concluded, Officer Losvar had probable cause to arrest Ricardo for felony

20  harassment because he was threatening to kill his family.  Although the family now adamantly

21  disputes that Ricardo was threatening them, their allegation is contradicted by the 911 call

22  transcript in which both Plaintiff and Joel pled for help, the fact that Officers Losvar and Pau found

23

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 11

the family barricaded in the bedroom, and the fact that Officers Losvar and Pau witnessed Ricardo brandishing knives.  Therefore, the first *Graham* element is satisfied.

Next, this Court considers whether Ricardo posed an imminent threat to Officers Losvar and Pau or others, the second *Graham* factor.  "In the deadly force context, [the court] cannot 'simply accept what may be a self-serving account by the police officer.'"  *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  "Because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'"  *Id.* (quoting *Scott,* 39 F.3d at 915).  "This includes 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'"  *Id.* (quoting *Scott*, 39 F.3d at 915).

Here, Plaintiff challenges the reasonableness of Officer Losvar's and Officer Pau's belief that Ricardo posed an imminent threat of serious harm to them or others at the time that they shot him.  *See* Dkt. No. 48 at 11–22.  She asserts that the "physical evidence contradicts" the officers' claims that Ricardo was approaching them in an aggressive manner.  *Id.* at 8.  Rather, she argues, Ricardo was "placing the knives on the porch" and attempting to surrender, as instructed, when the officers shot him.  Dkt. No. 19 at 4; *see also* Dkt. No. 48 at 20.  At a minimum, she argues, a genuine issue of material fact exists on this issue, rendering summary judgment inappropriate. Dkt. No. 48 at 20–22.

Plaintiff points to the following evidence in support of her argument.  Dkt. No. 48.  First, she points out that Corporal Riggles testified that Ricardo did not appear upset when he saw Ricardo right before the shooting.  *Id.* at 5:1–12.  Plaintiff argues that this testimony directly contradicts Officer Losvar's and Officer Pau's testimony that Ricardo was behaving aggressively

1   toward them.  *Id.* at 4–5; 8:16–17; 19–20.  Next, Plaintiff points out that it is undisputed that

2   Ricardo's body was face up and in the doorway of the trailer after he was shot.  *Id.* at 19–20.

3   Plaintiff argues that this contradicts the officers' claim that Ricardo was lunging at them when they

4   shot him.  *Id.*  Plaintiff also points to a police photograph from the scene of the shooting that shows

5   the knives neatly placed in a row on the floor.  *Id.* at 7–8.  Plaintiff claims that this photograph

6   calls into doubt the officers' testimony that the knives Ricardo was holding were scattered across

7   the deck after he was shot.  *Id.*  She also contends that the photograph is evidence that Ricardo had

8   put the knives down (in a neat row) because he was attempting to surrender to Officers Losvar and

9   Pau per their instructions.  *Id.*  Lastly, Plaintiff cites to report of Kay M. Sweeney, Plaintiff's

10  forensic expert, in which she opines that Ricardo was "hunched down" at the time he was shot,

11  suggesting that he was not lunging at the officers when he was killed.  *Id.* at 7:5–7.  The Court will

12  address each of Plaintiff's arguments in turn.

13      As stated above, Plaintiff argues that Corporal Riggles' testimony calls into doubt Officer

14  Losvar's and Officer Pau's testimony that Ricardo was acting aggressively.  Dkt. No. 48 at 5:1–

15  12.  Corporal Riggles testified that Ricardo did not "appear upset" at any time that he saw Ricardo

16  that evening.  Dkt. Nos. 51-9 at 2; 51-10 at 5 (stating that Ricardo did not "appear very upset").

17  However, Corporal Riggles also testified that when he saw Ricardo "it appeared he had a knife in

18  both hands" and that he heard Ricardo yell, "I can't kill myself so you guys are going to have to

19  do it for me."  Dkt. No. 51-9 at 2.  Finally, he testified that he saw Ricardo "exit[] outside further

20  onto the small porch" right before Officers Losvar and Pau shot him.  *Id.*  The Court concludes

21  that rather than contradict Officers Losvar's and Pau's testimony, Corporal Riggles' testimony

22  collaborates their claims that Ricardo was not acting rationally (*i.e.* asking the police to kill him),

23

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 13

that he had several knives in his possession at the time he was shot, and that he was moving towards Officers Losvar and Pau when they fired their guns at him.[2]

Next, Plaintiff argues that the fact that Ricardo's body was face up and laying in the doorway of the trailer creates a dispute of fact as to whether he was charging towards Officers Losvar and Pau when they shot him. Dkt. No. 48 at 7:5–7. Plaintiff claims that if Ricardo had been lunging towards the officers, he would have fallen forward face-down outside the doorway after he was shot. *Id.* Plaintiff presents no evidence for her claim that Ricardo would have fallen face forward when shot if he had been charging at the officers. Instead, she relies on the inquest testimony of Dr. Brian Mazrim, a forensic pathologist and medical examiner for King County Medical Examiner's Office, to argue that the bullets could not have "pushed" Ricardo back into the doorway. *Id.* at 6:14–23, 7:1–2. There are several problems with Plaintiff's argument. First, Plaintiff failed to authenticate Dr. Mazrim's inquest transcript, so it is inadmissible testimony. *See Commerce W. Ins. Co. v. Lucke*, 342 F. Supp. 3d 1098, 1101 (W.D. Wash. 2018) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). Second, even if Dr. Mazrim's testimony was admissible, it does not further Plaintiff's claim because Dr. Mazrim specifically stated that he had no opinion on what Ricardo was doing immediately before he was shot. *See* Dkt. No. 40–17 at 18:16–17, 20:1–2, 22:2–5. Lastly, Defendants do not claim that Ricardo had moved significantly away from the doorway when he was shot, rather Officers Losvar and Pau

---

[2] Defendants move to strike the excepts from the deposition of Corporal Riggles that Plaintiff sites in support of her opposition to the motion, claiming that they have not been properly authenticated. The Court agrees. The Corporal's deposition is not properly authenticated as it fails to contain a court reporter certification; therefore, it is inadmissible. *See Commerce W. Ins. Co.*, 342 F. Supp. at 1101 (citing *Orr*, 285 F.3d at 773) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). Thus, even if the Corporal's testimony contradicted the Officers' testimony—which it does not—the evidence would be inadmissible for purposes of this motion.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 14

testified that Ricardo "*started* towards them in an aggressive manner" and then "fell backward into the doorway that he had just exited, dropping the knives and landing on his back."  Dkt. Nos. 32-2 at 6; 36-1 at 6 (emphasis added).  This testimony is consistent with the crime scene photos that show Ricardo laying on his back halfway out the doorway.

Plaintiff also claims that Officers Losvar's and Pau's testimony that they observed knives "scattered" around Ricardo after he was shot is contradicted by a photograph showing the knives in a neat row.  Dkt. No. 48 at 7–8.  Plaintiff argues that the photograph calls into question the reliability of the officers' testimony and further establishes that Ricardo had actually placed the knives down to surrender before he was shot.  *Id*.  Plaintiff's theory is based on a photograph that was taken *after* the incident.  *See* Dkt. Nos. 40-6 at 90:1–91:6; 40-15 at 208:2–15, 213:18–215:12; 40-14 at 68:18–69:17 (explaining that the photograph was taken after the shooting and that the knives were likely lined up by someone at the scene after the shooting).  On the other hand, Officer Losvar's and Officer Pau's testimony that they saw Ricardo drop the knives after he was shot is corroborated by Lieutenant Schultz, Officer Smith, and Corporal Riggles who each testified that they saw several knives around Ricardo's body right after the shooting.  *See* Dkt. No. 37-1 at 2–3 (Lieutenant Schultz testifying that he saw several knifes underneath Ricardo's body); Dkt. No. 51-9 at 2 (Corporal Riggles testifying that he found a knife right next to Ricardo's hand when Officer Smith rolled Ricardo over onto his stomach to handcuff him); Dkt. No. 40-13 at 8:25–11:4 (Officer Smith testifying that he saw a knife near Ricardo's left hand).[3]

---

[3] Plaintiff presents testimony from her forensic expert, Kay Sweeney, in which Mr. Sweeney opines that the entry and exit bullet wounds on Ricardo are consistent with him "hunching down" to put the knives on the ground in surrender as opposed to lunging at Officers Losvar and Pau, as they claim. However, this Court previously granted Defendants' motion to strike Mr. Sweeney's report as unreliable because his conclusions are based on an incomplete review of the case materials and misstate the evidence. As such, Mr. Sweeney's testimony is inadmissible here.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 15

Although Plaintiff raises factual disputes within the record, the Court finds them immaterial and concludes there is sufficient undisputed evidence to demonstrate that it was objectively reasonable for Officers Losvar and Pau to believe that Ricardo presented an imminent danger to them, thus satisfying the second—and most important—*Graham* factor.  In reaching this decision, the Court finds *Watkins v. City of San Jose*, No. 15-cv-05786, 2017 WL 1739159 (N.D. Cal. May 4, 2017), *aff'd sub nom. Buchanan v. City of San Jose*, 782 Fed. App'x 589 (9th Cir. 2019) and *Estate of Yanira Serrano v. Trieu*, No. C-14-4081, 2016 WL 1089225 (N.D. Cal. Mar. 21, 2016), *aff'd sub nom. Estate of Serrano v. Trieu*, 713 Fed. App'x 631 (9th Cir. 2018) instructive.  Both cases addressed whether the officers' use of force was reasonable in the Fourth Amendment context.

*Watkins* involved decedent's family members who brought a 42 U.S.C. § 1983 action against the responding officers who shot and killed the decedent following his 911 call, in which he falsely reported that a man with a knife was threatening to kill his family and that he was locked in a room with his children.  *Watkins,* 2017 WL 1739159, at *1.  The officers were not aware when dispatched that, earlier that day, the decedent was suicidal because his fiancé had told him that she no longer wanted to marry him.  *Id*. at *4–5.  Upon arriving on the scene, the officers reported that a man began to walk towards them, carrying a knife at his side with the blade pointing up.  *Id*. at *1–2.  The officers drew their guns and commanded the decedent to surrender.  *Id*. at *2.  The man refused to comply with the officers' instructions.  *Id*.  As the man continued to advance towards the officers, the officers fired their weapons and killed him while he was standing about 55 feet from them.  *Id*. at *3.  As part of the investigation, there was conflicting testimony as to whether the man had accelerated and lunged towards the officers, the distance between the officers and the man when they fired their weapons, and whether the decedent was attempting to comply with their

orders to surrender. *Id*. at *1–6.  The plaintiffs sued the officers, alleging, among other things, that the officers had violated the decedent's Fourth Amendment rights by using excessive force when they shot him. *Id.* at *6.  The officers moved for summary judgment and the district court granted the motion. *Id.*   The plaintiffs appealed, arguing that the trial court erred because there were material issues in dispute as to whether the officers acted reasonably. *Buchanan*, 782 Fed. App'x 589 at 590.  The Ninth Circuit disagreed with the plaintiffs, finding that there was ample evidence in the record—even viewed in the light most favorable to the plaintiffs—to demonstrate that the officers used reasonable force when they shot the decedent. *Id.* at 591–593.

Similarly, *Estate of Yanira Serrano v. Trieu* involved a police officer who shot a mentally-ill woman after responding to a 911 call that reported that a woman was engaging in erratic behavior with a kitchen knife after failing to take her medication for schizophrenia. *Estate of Yanira Serrano v. Trieu*, 2016 WL 1089225, at *1–2.  Upon arriving at the scene, the officer saw Ms. Serrano who was holding an eleven-inch knife on the front porch of her residence. *Id*. at *2. When Ms. Serrano saw the officer, she began walking towards him. *Id*.  The officer "backpedaled" down the block, away from her and towards his vehicle. *Id*. at *3.  Ms. Serrano followed, still holding the knife above her shoulder. *Id*.  As the officer ran down the street, he yelled over his shoulder, commanding her to "stop". *Id*.  Ms. Serrano did not comply with that order nor did she lower the knife in her hand; after retreating for approximately 160 feet, the officer finally turned toward Ms. Serrano, this time pointing his firearm at her, and ordered her to "stop". *Id*.  When she did not comply with his order, the officer shot and killed Ms. Serrano. *Id*.  Ms. Serrano's family members filed a 42 U.S.C. § 1983 suit against the officer, alleging (among other things) that he violated Ms. Serrano's Fourth Amendment rights by using excessive force against her. *Id*. at *4. The officer moved for summary judgment, which the district court granted finding that there were

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 17

no triable issues as to plaintiffs' claim that the officer's use of deadly force was unreasonable.  *Id.* at *5–8.  The plaintiff appealed, arguing that the trial court erred because there were material issues in dispute as to whether the officer's use of deadly force was reasonable.  *Estate of Serrano*, 713 Fed. App'x at 631.

On appeal, the Ninth Circuit upheld the district court's grant of summary judgment, finding that the record, viewed in the light most favorable to the plaintiff, was sufficient to demonstrate that the officer acted reasonably when firing his weapon.  *Id.* at 632.  In reaching its conclusion, the Ninth Circuit determined that the evidence demonstrated that Ms. Serrano had acted aggressively towards the officer while holding a knife, chasing after him, and refusing to comply with his commands.  *Id.*  The court held that, "[a]t a minimum, summary judgment was proper because the plaintiffs have not pointed to any case that would have placed [the officer] on 'fair notice' that the use of deadly force was unconstitutional under the circumstances of this case." *Id.* (quoting *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011) ("Officers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.'"); quoting *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.")).

Similarly here, the Court finds that there exists no triable issues as to whether it was objectively reasonable for Officers Losvar and Pau to believe that Ricardo presented an imminent danger to them.  Like the facts and holdings in *Buchanan* and *Estate of Yanira Serrano*, Ricardo appeared to be advancing towards the officers while holding a knife and refusing to comply with Officers Losvar and Pau's commands. Irrespective of the distance between them, the officers thought Ricardo was an "immediate threat" and were "justified their use of deadly force."

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 18

1    *Buchanan*, 782 Fed. App'x 589 at 591; *see also Lal v. California*, 746 F.3d 1112, 1118–19 (9th

2    Cir. 2014) (holding that officers' use of deadly force was reasonable when suspect had ignored the

3    officers' commands, had previously shown his intent to injure others, and had charged at the

4    officers with a rock over his head).

5         The Court also concludes that the final *Graham* factor—whether Ricardo was resisting

6    arrest—is satisfied.  As stated above, Plaintiff contends that Ricardo was attempting to surrender

7    when he was shot.  Dkt. No. 48 at 7–8.  However, Plaintiff has presented no reliable evidence to

8    support her claim and instead, all of the evidence in the record, direct or circumstantial,

9    demonstrates that Ricardo refused to comply with Officer Losvar's and Officer Pau's orders to

10   surrender.

11        Plaintiff relies extensively on a recent Ninth Circuit case, *Cruz v. City of Anaheim*, to argue

12   that Officers Losvar and Pau used excessive force when they shot and killed Ricardo.  Dkt. No. 48

13   at 13–16; 19–21 (citing *Cruz v. City of Anaheim,* 765 F.3d 1076 (9th Cir. 2014)).  In *Cruz*, Anaheim

14   police officers shot the decedent during a felony traffic stop, claiming they believed he was

15   reaching for a gun from his waistband.  765 F.3d at 1077–78.  Relatives of the decedent brought

16   suit against the city and its officers, alleging among other claims, that the officers used excessive

17   force when they shot the decedent.  *Id*. at 1077–78.  The trial court granted summary judgment in

18   favor of the officers and the relatives appealed.  *Id*. at 1076–78.  The Ninth Circuit reversed stating

19   that the discrepancies between the officers' version of events and the physical evidence and

20   eyewitness testimony could "give a reasonable jury pause."  *Id*. at 1079.  In *Cruz*, there was

21   testimony from an eyewitness that the decedent appeared to be slipping and falling as he exited his

22   car, just before police shot him.  *Id*. at 1080.  This conflicted with the officers' accounts that the

23   decedent had "fully emerged from his SUV and was poised to attack."  *Id*.  The officers also

claimed that the decedent had exited the vehicle and was standing in the doorway, but then testified they had to cut him from his seatbelt after the shooting. *Id*. In addition, the decedent was left-handed, but the officers stated he drew for his gun with his right hand. *Id*. Lastly, no weapon was found on the decedent after he was shot. *Id*. at 1078–79.

Plaintiff's reliance on *Cruz* is misplaced. The facts of that case are readily distinguishable from the instant case. First, here, unlike in *Cruz*, there is no eyewitness testimony that conflicts with Officer Losvar's and Officer Pau's claim that Ricardo refused to comply with their instructions to surrender. Second, unlike in *Cruz*, Officer Losvar's and Officer Pau's testimony is internally consistent. Lastly, while the decedent in *Cruz* was unarmed, Ricardo had several knives in his possession at the time of the shooting. Simply put, there are no discrepancies between Officer Losvar's and Officer Pau's version of events and the physical evidence and eyewitness testimony in this case that could "give a reasonable jury pause" that the officers used objectively lawful force in response to Ricardo's actions. *Id*. at 1079.

Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's Fourth Amendment claims.

## 2.    Fourteenth Amendment Claim: Deprivation of Familial Relationship

A parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of her child. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Therefore, if a parent loses companionship with a child through an officer's excessive use of force, the parent may bring a claim under the Fourteenth Amendment. *Id*. To establish such a claim, the plaintiff must prove that the officer's action "shocks the conscience." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). This standard differs from the excessive force standard under the Fourth Amendment. *Hayes*, 736 F.3d 1223 at 1230. "In

determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* "Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious." *Farmer v. Brennan*, 511 U.S. 825, 826 (1994).

Here, Ms. Hernandez brings a claim for the deprivation of her familial relationship with Ricardo. Dkt. No. 19 at 11:16–21. Defendants argue that summary judgment is warranted with respect to Plaintiff's Fourteenth Amendment claim because there are no material facts in dispute that Officers Losvar and Pau "used reasonable force under the Fourth Amendment." Dkt. No. 30 at 23:6–12. Plaintiff fails to even address this issue in her opposition to the summary judgment motion.

As the Court has already established, the officers did not use excessive force when shooting Ricardo and their actions were reasonable; therefore, *a fortiori*, their conduct does not shock the conscious. Accordingly, the Court's analysis of this claim stops here because there are no material issues of fact for the jury to resolve.

Defendants' Motion for Summary Judgment as to Plaintiff's Fourteen Amendment claim is GRANTED.

### 3.   Federal Qualified Immunity

While the Court has already concluded that Defendants did not violate Plaintiff's or Ricardo's Fourth and Fourteenth Amendment rights, the Court nevertheless will address whether Defendants are entitled to federal qualified immunity.   Federal "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [officer] would have known.'"   *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009) (finding that federal qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'").   In *Pearson v. Callahan,* the Supreme Court, explained that a district court must analyze whether a party is entitled to federal qualified immunity at the summary judgment stage by determining, whether the facts alleged, taken in the light most favorable to the plaintiff, show that an officer's conduct: a) violated a constitutional right; and b) the right at issue was "clearly established" at the time of defendant's alleged misconduct.   555 U.S. 223 at 232.

The Supreme Court's recent decision in *Kisela v. Hughes* is directly on point.  138 S. Ct. 1148 (2018).   In *Kisela*, an officer responded to a 911 call in which the caller reported seeing a woman acting erratically while holding a large kitchen knife.   *Kisela*, 138 S. Ct. at 1151.   Upon arriving at the scene, the officers reported that they saw a woman emerge from her house carrying a large kitchen knife at her side with the blade pointing backwards.   *Id*.   Close by, a bystander, who the officers later learned was the woman's roommate, was standing outside the house in the vicinity of the driveway.   *Id*.   As the woman approached the bystander, the officers drew their guns and instructed the woman to drop the knife.   *Id*.   The woman refused to comply with the instructions.   *Id*.   As the woman continued to approach the bystander, the officer shot her.   *Id*.

Plaintiff sustained non-life-threatening injuries. *Id*. As part of the investigation, there was conflicting officer testimony as to whether the woman had raised the knife.

The plaintiff sued the officer, alleging that he violated her Fourth Amendment rights by using excessive force when he shot her. *Id*. The officer moved for summary judgment, contending among other defenses that he was entitled to qualified immunity because he neither violated a clearly established right nor did he have reason to believe that the use of deadly force was a violation of the plaintiff's civil rights. *Id.* The district court granted summary judgment to the officer. *Id*. The plaintiff appealed, arguing that the trial court erred because there were material issues in dispute as to whether the officer's use of force was lawful, thus precluding the issue of federal qualified immunity. *Id*. On appeal, the Ninth Circuit reversed the district court's grant of summary judgment, finding among other issues that the record, viewed in the light most favorable to the plaintiff, was sufficient to demonstrate that the officer was not entitled to qualified immunity because his actions had violated clearly established law in that jurisdiction. *Id.*

The Supreme Court granted *certiorari* and held that the officer was entitled to federal qualified immunity because he had not used excessive force when he shot the plaintiff, citing to the officer's subjective belief that the plaintiff was a threat to the bystander because she was not only carrying a knife but according to the 911 call that dispatched the officer had been acting erratically before the officers were dispatched through a 911 call. *Id.*

Taking the facts in the light most favorable to the Plaintiff, this Court found, *supra*, that the officers did not violate Ricardo's constitutional rights. *See Kisela*, 138 S. Ct. at 1152 ("Immunity protects all but the plainly incompetent or those who knowingly violate the law."). As the Supreme Court found in *Kisela,* this Court finds that the officers had a reasonable, subjective

belief that Ricardo was an imminent threat given that he was carrying multiple knives and had been acting erratically according to the 911 call.

As such, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claim for federal qualified immunity.

**B.   Plaintiff's State Law Claims**

Defendants also move for summary judgment on Plaintiff's state law claims for negligence, outrage, assault, and discrimination under the Washington Law Against Discrimination ("WLAD"), RCW § 49.60.030, et seq.  Dkt. Nos. 30, 55.  Plaintiffs object and argue that there are several material disputes of fact that remain, precluding summary judgment at this stage.  Dkt. No. 48.  The Court will address each of these claims in turn.

1.   Negligence

Ms. Hernandez contends that the responding officers were negligent when responding to Ricardo's actions after her 911 call for two reasons: (1) she contends that a special relationship existed between the officers and Ricardo once the officers told Ricardo to surrender to them, drop his knives, and submit to arrest; and (2) the officers did not exercise reasonable care when dealing with Ricardo, an individual experiencing a mental health episode.  Dkt. No. 48 at 27–30.  According to Plaintiff, the officers should have foreseen that their arrival would escalate the situation and should have summoned a crisis team to the scene.  *Id*. at 30.  She argues that the Court should allow this claim to survive the summary judgment stage because a reasonable "jury must decide whether it was foreseeable that officers of the Federal Way Police Department could cause the situation to escalate and whether they knew or should have known that Ricardo was experiencing a mental health episode and suicidal." *Id*. at 30:16–19.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 24

1    "As a general rule, law enforcement activities are not reachable in negligence." *McGregor*

2    *v. Kitsap Cty.*, No. C17-5436, 2017 WL 6612012, at *2 (W.D. Wash. Dec. 27, 2017) (quoting

3    *Keates v. City of Vancouver*, 869 P.2d 88, 93 (Wash. Ct. App. 1994)).  The public duty doctrine

4    recognizes that the duty of officers to provide protection is normally owed to the public at large

5    and is unenforceable as to individual members of the public.  *Thomas*, 2017 WL 2289081, at *14

6    n.7; *see also Estate of Wasilchen v. Gohrman*, 870 F. Supp. 2d 1115, 1140 (W.D. Wash. 2012),

7    *aff'd sub nom. Tubbs v. Gohrman*, 539 Fed. App'x 788 (9th Cir. 2013); *Vergeson v. Kitsap Cty.*,

8    186 P.3d 1140, 1145 (Wash. Ct. App. 2008); *Beal for Martinez v. City of Seattle,* 954 P.2d 237

9    (Wash. 1998).  This is often referred to as the public duty doctrine.  *Id.*

10    Washington courts have long recognized an exception to the public duty doctrine where a

11    special relationship existed between the officers and the plaintiff.  *Cummins v. Lewis Cty.*, 98 P.3d

12    822, 825 (Wash. Ct. App. 2004), *aff'd,* 133 P.3d 458 (Wash. 2006).  "An exception to the public

13    duty doctrine provides that if a 'special relationship' exists between the public officer and the

14    plaintiff, a duty owed to the individual may arise."  *McGregor*, 2017 WL 6612012, at *2 (quoting

15    *Thomas,* 2017 WL 2289081, at *14 n.7).  "To create a special relationship between police officer

16    and citizen, Washington law requires direct contact setting the citizen apart from the general

17    public, and 'express assurances' of assistance that give rise to a justifiable reliance on the part of

18    the citizen."  *McGregor*, 2017 WL 6612012, at *2 (quoting *Beal*, 954 P.2d at 776–77).

19    Here, Plaintiff alleges that a special relationship existed between Ricardo and the officers

20    because the officers were no longer treating Ricardo as a member of the general public.  Dkt. No.

21    48 at 30:6–8.  Plaintiff further contends that officers gave Ricardo explicit assurances of protection

22    "when they drew [their] guns and point[ed] them" at him so he could surrender and "attempt[] to

23    comply with those commands."  *Id.* at 30:8–11.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 25

Plaintiff's argument fails to persuade.  There is no evidence whatsoever that Ricardo relied on any express assurances that he allegedly received from the officers.  *See Torres v. City of Anacortes*, 981 P.2d 891, 897 (Wash. Ct. App. 1999) (quoting *Honcoop v. State*, 759 P.2d 1188, 1194 (Wash. 1988)) ("In Washington, 'a governmental duty cannot arise from implied assurances.'"); *see also McGregor,* 2017 WL 6612012, at *2 (citing *Hamilton v. City of Olympia,* 687 F. Supp. 2d 1231, 1248 (W.D. Wash. Sep. 8, 2009)) ("an actionable duty to provide police services will arise if . . . there are explicit assurances of protection that give rise to reliance on the part of the victim.").  The record is devoid of any evidence that would allow the jury to find for Plaintiff on this claim.  Thus, the Court finds Plaintiff has not raised any issues of material fact in support of  her negligence claim predicated on a special relationship between the officers and Ricardo.

Next, the Court turns to Plaintiff's argument that responding officers were negligent because they did not use reasonable care when interacting with Ricardo even though they were aware he was going through a mental health crisis.  Plaintiff alleges that the officers acted negligently towards Ricardo when they failed to use "de-escalation tactics" to defuse the situation. Dkt. No. 48 at 30.  However, as stated above, Plaintiff must establish that a "special relationship" existed between Ricardo and the officers to maintain a negligence claim against Defendants. Plaintiff has failed to do so.  As such, this claim must be dismissed.  *See Washburn v. City of Fed. Way*, 310 P.3d 1275, 1289 (Wash. 2013).

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim is GRANTED.

2.  <u>Outrage</u>

A claim for outrage requires a showing of "(1) extreme and outrageous conduct, (2)

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 26

intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress." *Monetti v. City of Seattle*, 875 F. Supp. 2d 1221, 1231 (W.D. Wash. 2012) (quoting *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989)); Restatement (Second) of Torts § 46 (1965)). The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Estate of Lee ex rel. Lee v. City of Spokane*, 2 P.3d 979, 990 (Wash. Ct. App. 2000) (citing *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)) (emphasis omitted). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury. *McClain v. City of Tacoma*, No. 06-cv-5016, 2007 WL 2495384, at *7 (W.D. Wash. Aug. 30, 2007) (citing *Birklid v. Boeing Co.*, 904 P.2d 278, 286 (Wash. 1995)). However, it is the trial court's responsibility to determine "whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Johnson v. City of Olympia*, No. 17-cv-5403, 2018 WL 4681554, at *2 (W.D. Wash. Sept. 28, 2018) (citing *Dicomes*, 782 P.2d at 1012). The standard for whether conduct is considered "outrageous" is a high one: "[I]t is not enough that a 'defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Johnson*, 2018 WL 4681554, at *2 (citing *Grimsby*, 530 P.2d at 295); Restatement (Second) of Torts § 46 (1965).

No reasonable jury could find that the officers' interactions with Ricardo or his family approached the outrage threshold, based on the events set forth in this opinion. *See McClain*, 2007 WL 2495384, at *7 (holding that police officers who responded with deadly force to domestic violence suspect when he opened door to his house and pointed rifle directly at officer's chest after

being told to put if down did not commit tort of outrage against suspect or suspect's family members).

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's outrage claim is GRANTED.

### 3. Assault

Plaintiff brings a claim for assault based on the officers' use of excessive force.  Dkt. No. 48 at 27:14–17.  This Court has already determined that Officers Losvar and Pau did not use excessive force when they shot Ricardo.  Therefore, Plaintiff's assault claim must be dismissed.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's assault claim is GRANTED.

### 4. Discrimination

Ms. Hernandez brings a claim for discrimination under the Washington Law Against Discrimination ("WLAD"), RCW § 49.60.030, et seq.  Dkt. No. 48 at 30–32.  She alleges the officers discriminated against Ricardo because he was having a mental health episode and because he was Latino.  *Id.*  The officers move for summary judgment, asserting there are no material factual disputes as to whether their actions were discriminatory.  Dkt. No. 30 at 30–31.  The WLAD states that every individual has a right to be free from discrimination based on, among other things, race, creed, color, national origin, and mental disability.  RCW 49.60.030.

The Court finds that Plaintiff provides no factual evidence—whatsoever—to support her claim that the officers took any action due to Ricardo's Latino ethnicity or any potential mental disability. *Frisino v. Seattle Sch. Dist. No. 1*, 249 P.3d 1044, 1048 (Wash. Ct. App. 2011) (holding that an adverse party may not rest upon mere allegations or denials but must instead set forth

specific facts showing the existence of a genuine issue for trial).  Ms. Hernandez has not carried her burden of demonstrating that there exist material disputed facts for the jury to decide.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's discrimination claim is GRANTED.

### III.   CONCLUSION

For the foregoing reasons, the Court rules as follows:

1. Defendant City of Federal Way's Motion for Summary Judgment is GRANTED on Plaintiff's municipal liability claim;

2. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's Fourth and Fourteenth Amendment claims;

3. Defendant Officers Losvar's and Pau's Motion for Summary Judgment is GRANTED on their claims for federal and state qualified immunity;

4. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's state law claims; more particularly, her claims of negligence, outrage, assault, and discrimination.

The Court having GRANTED Summary Judgment on all of Plaintiff's claims and having found that Officers Losvar and Pau are entitled to qualified immunity under both federal and state law, this action is hereby DISMISSED.

**IT IS SO ORDERED.**

DATED this 24th day of April, 2020.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 29